UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

John Hock,

      Plaintiff and
      Counter-Defendant,

v.

Franconia Sculpture Park,

      Defendant and
      Counter-Claimant.

File No. 24-cv-3546 (ECT/EMB)

**OPINION AND ORDER**

---

Michael M. Lafeber, Taft Stettinius & Hollister LLP, Minneapolis, MN, for Plaintiff John Hock.

Grant D. Fairbairn, Luke P. de Leon, Barbara Marchevsky, Fredrikson & Byron, P.A., Minneapolis, MN, and Erin M. Boggess, Fredrikson & Byron, P.A., Des Moines, IA, for Defendant Franconia Sculpture Park.

---

In 2018, John Hock completed a 53-foot steel sculpture, *Prometheus III*. The work was displayed in Franconia Sculpture Park, an institution Mr. Hock co-founded and his then-employer. In 2019, Franconia terminated Mr. Hock, and he agreed to remove *Prometheus III* from the park. By late 2023, he had not done so, and Franconia, believing the sculpture was abandoned, disassembled it and sold it for scrap. Mr. Hock sued for violations of the Visual Artists Rights Act, a federal statute that protects artists' "moral rights," including the right not to have certain artworks destroyed. He also raised several state-law claims.

Franconia moves for summary judgment on the federal claim and all but one of the state-law claims. The federal statute does not protect works made for hire or those that lack recognized stature. Because there are factual disputes on both issues, summary judgment will be denied. Mr. Hock has shown evidence of the artwork's market value, so he may choose to seek actual or statutory damages. On the state-law claims, a reasonable jury could find that Mr. Hock had not abandoned his sculpture by the time of its destruction, so summary judgment will be denied there too.

Franconia also moves to exclude testimony from Mr. Hock's expert, and this motion will be granted in part and denied in part. The appraisal expert submitted a report that combined two methods of assessing the sculpture's fair market value, and both will be excluded. As to the sales comparison approach, she did not meaningfully rely on it or show that it was a reliable method under the Federal Rules of Evidence. As to the cost approach, her opinion inappropriately parrots out-of-court statements to prove the truth of the matter they assert, so it is inadmissible. Her opinion that *Prometheus III* had "stature" under the Visual Artists Rights Act relies on appropriate evidence, so it is admissible and will not be excluded.

I[1]

*John Hock is an artist specializing in sculpture.* John Hock earned a Bachelor of Arts degree with a concentration in sculpture and painting from Pennington College, and a Master of Fine Arts degree from Syracuse University. ECF No. 147 at 10:5–16. Mr. Hock

---

[1]    The facts are undisputed or described in a light most favorable to Mr. Hock. *See* Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 378 (2007).

received fellowships and awards from the National Foundation for the Advancement of Arts, New York Foundation for the Arts, McKnight Foundation Individual Artists Grant, Athena Foundation, and the Pollock-Krasner Foundation Award, and he received the Northeast Minneapolis Art District's 2023 Vision Award.  ECF No. 130 ¶ 3.  His sculptures have been displayed in collections and sculpture parks in the United States and England. *Id.* ¶ 2.

*Mr. Hock co-founded Franconia Sculpture Park and served as its Artistic Director.* Mr. Hock co-founded Franconia Sculpture Park in 1995 and began exhibiting artwork there in 1996.  ECF No. 147 at 15:3–5.  "Franconia is the pre-eminent, artist-centered sculpture park in the Midwest."  Countercl. [ECF No. 81] at 9 ¶ 1;[2] ECF No. 90 ¶ 1 (admitting that portion of the allegation).  Mr. Hock served as Franconia's CEO/artistic director.  ECF No. 147 at 15:1–2.  While working there, his job responsibilities were broad—they included "overseeing operations," "financial management," "administrative programs," "artistic programs," as well as "mentoring," "inspiring," and "educating young artists." *Id.* at 16:4–18 (citation modified).  Franconia had the right to assign tasks to Mr. Hock. *Id.* at 17:1–3. By 2006, Franconia provided Mr. Hock with a W-2 Form. *Id.* at 26:13–21, 28:9–29:19. In a 2013 annual performance review, Mr. Hock indicated an intent to "work on my own sculpture," and Franconia's Board incorporated that note into his review. *Id.* at 21:4–23; ECF No. 122-4 at 4.  Those notes questioned whether "Performance" was the "right word" for the goals, and included Mr. Hock's aim to "expand funding base," build the park's

---

[2]     Page citations are to a document's CM/ECF pagination appearing in the upper right corner, not to a document's original pagination.

capacity, establish a multi-year development plan, and "take better care of self."  ECF No. 122-4 at 4.  In his 2016 performance review, the Board noted it "was happy to see progress on [Mr. Hock's] personal sculpture at Franconia."  ECF No. 133 at 2.

*Mr. Hock began creating* Prometheus III.  In about 2006, and possibly earlier, Mr. Hock started work on *Prometheus III*.  ECF No. 147 at 25:16–26:19.[3]  It was his third in a series of sculptures named after Prometheus, the mythological Titan who stole fire from the heavens and was punished by Zeus.  ECF No. 130 ¶ 5.  Mr. Hock created *Prometheus III* to inspire resident artists at Franconia and the world, and "to make [his] most ambitious, monumental sculpture to date."  ECF No. 147 at 37:9–38:11; *see* ECF No. 143-1 at 6 (showing Mr. Hock's Facebook post stating that the sculpture was meant to challenge and inspire resident artists).  He built it on Franconia's grounds during daylight hours on his own time.  ECF No. 147 at 37:2–8; ECF No. 130 ¶ 7.  Several people assisted on the project, including Franconia staff members.  ECF No. 147 at 86:11–25, 105:7–11.  They worked for Mr. Hock "on their days off" of their employment with Franconia, *id.* at 86:16–17, and Mr. Hock paid them personally, ECF No. 130 ¶ 6; *see* ECF No. 122-7 (showing record of payment to one worker).  The tools came from various sources—some belonged to Franconia, like the forklift and pickup truck, ECF No. 147 at 83:23–85:6, and some belonged to Mr. Hock, like the MIG welder, *id.* at 73:3–8, and oxygen acetylene torch, *id.* at 75:25–76:16.  Mr. Hock purchased the supplies himself, including two 10-foot-diameter metal tanks, *id.* at 38:18–39:7, a steel plate, *id.* 40:1–13, cement barrels, *id.* at 49:10–22,

---

[3]     Elsewhere the record shows Mr. Hock began work on *Prometheus III* in 2001.  ECF No. 112-1 at 16.  The exact year does not matter for deciding these motions.

and primer and paint, ECF No. 130 ¶ 6. He stored materials on Franconia's grounds. ECF No. 147 at 77:13–24. Franconia did not "attempt to exercise any control" over the creation of *Prometheus III*, and it did not claim an ownership interest in the work before this litigation arose. ECF No. 130 ¶ 8. The sculpture was completed in 2018, standing 53 feet tall and weighing around 34,000 pounds. ECF No. 130 ¶ 6; ECF No. 112-1 at 16. Mr. Hock spent about $40,000 of his personal funds on the project. ECF No. 132 at 313:5–23.

*Media coverage for Prometheus III was minimal.* While it was being constructed, *Prometheus III* was mentioned (though not discussed) in a blog post. *Franconia Sculpture Park*, Little USA Trips (Sep. 16, 2013), https://littletripsdotcom.wordpress.com/2013/09/16/franconia-sculpture-park (last visited June 1, 2026) (filed at ECF No. 121-7) (showing thumbnail image of the unfinished sculpture). After its completion, the work was briefly described in and photographed for an article in the *Minneapolis Star Tribune*. Alicia Eler, *A Walk in the Park*, Minneapolis Star Trib., July 27, 2018, at E1 (filed at ECF No. 121-6). The author, a staff writer for the paper, wrote that *Prometheus III* "appears at first to be supertough [sic], but its circular shapes convey a softness. It finds a home amid all the other quirky finds at [Franconia], a landscape that only a bunch of sculptors could cobble together, summer after summer." *Id.* at E12; ECF No. 121-6 at 3; ECF No. 147 at 132:20–133:4. *Prometheus III*'s maquette—a small model of the work—was displayed in an unidentified gallery in Chicago, ECF No. 147 at 127:4–13, and a private collector purchased it in 2001 for $12,000, ECF No. 112-1 at 18. *Prometheus III* never moved from Franconia, appeared in an art magazine or academic art journal, received an award, or was

featured in a press release.  ECF No. 147 at 127:19–21, 128:11–25; 129:18–20, 131:18–23.

*Franconia terminated Mr. Hock's employment, and the parties agreed that Mr. Hock would retrieve Prometheus III.*[4]  In August 2018, Franconia terminated Mr. Hock's employment.  *Id.* at 134:4–13.  Mr. Hock sued Franconia, and the parties reached a confidential settlement agreement in December 2019.  ECF No. 122-3.  In that document, Mr. Hock agreed to remove *Prometheus III* from the park "at a mutually agreeable time." *Id.* at 5–6; *see* ECF No. 147 at 155:3–19.  From 2020 to 2023, Mr. Hock did not contact Franconia about retrieving *Prometheus III*.  ECF No. 147 at 156:5–156:16.

*Mr. Hock attempted to relocate and sell the sculpture.*  In September and October 2023, Mr. Hock communicated over email with sculptor John Isherwood and art collector

---

[4]    The parties have sealed or redacted information related to Mr. Hock's termination and their related settlement agreement.  Some of this material will be presented publicly here, for two reasons.  First, the facts are relevant to deciding the motion for partial summary judgment.  *See Laughlin v. Stuart*, No. 19-cv-2547 (ECT/TNL), 2021 WL 1338086, at *3 (D. Minn. Apr. 9, 2021) ("[T]he public's interest [in accessing judicial records] is stronger when the sealed items implicate a district court judge's exercise of Article III power in deciding a dispositive motion on the merits." (quoting *Willis Elec. Co. v. Polygroup Ltd. (Macao Com. Offshore)*, No. 15-cv-3443 (WMW/KMM), 2019 WL 2574979, at *1 (D. Minn. June 24, 2019))).  Courts should weigh "the role of the material at issue in the exercise of Article III judicial power and resultant value of such information to those monitoring the federal courts." *IDT Corp. v. eBay*, 709 F.3d 1220, 1224 (8th Cir. 2013) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)); *see Schmidt v. DePuy Synthes Sales, Inc.*, No. 21-cv-2353 (NEB/DJF), 2024 WL 3565802, at *2 (D. Minn. July 29, 2024) (declining to seal information "necessary for a complete understanding" of the opinion).  Second, the relevant information is already publicly available.  MPR News discussed the settlement agreement in March 2024 in an article that Mr. Hock submitted, unsealed, in the record.  ECF No. 130-3 at 3; Alex V. Cipolle, *Sold for Scrap: Franconia Sculpture Park Removes Sculpture by Founder*, MPR News (updated Mar. 18, 2024), https://www.mprnews.org/story/2024/03/15/sold-for-scrap-franconia-sculpture-park-removes-sculpture-by-founder (last visited June 1, 2026).

Laurence Foy.  ECF No. 132 at 220:22–222:8.  Mr. Hock wrote Mr. Isherwood, "PROM III needs a new home."  *Id.* at 222:9–13.  Mr. Isherwood connected him to Mr. Foy, "an art collector [who] also has contacts that enable the placement and sale of artworks," and Mr. Hock wrote Mr. Foy about "find[ing] a new home" for *Prometheus III*.  *Id.* at 222:14–223:20.  Over the next few days, Mr. Hock called Mr. Foy twice to discuss the sculpture, and Mr. Foy did not make an offer.  *Id.* at 224:8–225:17.  Mr. Foy testified that he reached out to a few sculpture parks or galleries and possibly some art collectors, who found the piece interesting but deferred a decision to purchase it.  ECF No. 136 at 73:3–74:23; *see* ECF No. 130-7 at 2 (Mr. Foy's February 12, 2024 letter stating he "continued to try and find this sculpture an interested buyer").

*Franconia attempted to contact Mr. Hock about* Prometheus III.  Mr. Hock did not contact Franconia about removing the sculpture in the years following his departure, as he "didn't want to be in communication with them."  ECF No. 147 at 154:10–13, 156:5–157:10.  Franconia attempted to contact him at least two times.  On May 26, 2023, Franconia Board member Sara Rothholz-Weiner sent Mr. Hock an email with the subject line, "connect please."  ECF No. 122-8 at 2; *see* ECF No. 122-2 at 69:7–70:11.  The email said, "I am working over at Franconia now and wonder if you'd have a minute to connect."  ECF No. 122-8 at 2.  The message did not mention *Prometheus III*, deadlines for its removal, or Franconia's intention to destroy it.  *Id.*; ECF No. 122-2 at 70:17–71:12.  On May 31, 2023, Mr. Hock attempted to reply, "What do you want?" but inadvertently forwarded the message to himself.  ECF No. 147 at 213:7–19; ECF No. 122-8 at 2.  He believed he had responded to Ms. Rothholz-Weiner, but she did not receive his message.

7

ECF No. 147 at 213:12–16, 215:4–23.  Ms. Rothholz-Weiner called Mr. Hock on the phone, and the parties dispute what happened.  She testified that she called twice about a week after her May 26 email and left a voicemail both times, indicating that "[i]t would be really good to talk," though not explicitly mentioning *Prometheus III*.  ECF No. 122-2 at 71:14–73:4.  Mr. Hock testified that he had received just one call from her, which he did not answer, and that she had not left any voicemails.  ECF No. 147 at 194:25–195:14.

*Franconia removed Prometheus III and sold it for scrap metal.*  In November 2023, Franconia's Artistic Director, Alex Legeros, arranged for *Prometheus III*'s removal.  ECF No. 122-1 at 93:9–13.  An auto salvage shop disassembled and removed the sculpture on December 28, 2023.  *Id.* at 113:24–114:4.  Mr. Hock did not realize *Prometheus III* had been destroyed until February 6, 2024.  ECF No. 147 at 186:10–19.  Though his property bordered the park, there were layers of tall trees and a hill blocking his view of the sculpture.  *Id.* at 187:23–188:14.

*After Prometheus III was removed and destroyed, some art enthusiasts described it favorably.*  In response to the sculpture's destruction, artist and sculptor Andrew MacGuffie and sculptor and professor of sculpture Coral Penelope Lambert wrote a joint letter to Franconia expressing their "disbelief" that the park had removed and scrapped *Prometheus III*.  ECF No. 130-5 at 3.  They described their "firsthand" knowledge of its construction, and held it to be "a mainstay of the park," "a major landmark," and "a monument."  *Id.* at 2–3.  Similarly, Mr. Foy testified that it was "pretty monumental" and could be worth $400,000 to $500,000 if Mr. Hock "were a little more famous."  ECF No. 121-1 at 89:15–20.  He noted in a letter that he had "found the work to be quite intriguing

8

and accomplished," with "obvious artistic value."  ECF No. 130-7 at 2.  And when Mr. Hock posted on his Facebook page about *Prometheus III*'s removal and scrapping, some artists and art critics commented favorably on the work.  ECF No. 147 at 129:21–130:24; *see* ECF No. 130-4 at 21 (showing artist Ann Klefstad's comment that "[t]his sculpture should have remained a signature work of Franconia"); ECF No. 130-4 at 20 (showing sculptor Guy Snover's comment that *Prometheus III* "was like a monument that told every young artist who came to the park that Franconia was a place where you could dream big").  *Prometheus III*'s destruction was reported in local news.  *See* Alex V. Cipolle, *Sold for Scrap: Franconia Sculpture Park Removes Sculpture by Founder*, MPR News (Mar. 18, 2024),  https://www.mprnews.org/story/2024/03/15/sold-for-scrap-franconia-sculpture-park-removes-sculpture-by-founder (last visited June 1, 2026) (filed at ECF No. 130-3).

*Mr. Hock filed suit.*  Mr. Hock brought this suit in September 2024, Compl. [ECF No. 1], and filed the operative Second Amended Complaint in May 2025, Second Am. Compl. [ECF No. 71].  His only federal claim alleges violations of the Visual Artists Rights Act of 1990 ("VARA"), 17 U.S.C. § 106A.  Second Am. Compl. ¶¶ 17–25.  The remaining claims arise under state law: Count II, negligence, *id.* ¶¶ 26–30; Count III, breach of contract, *id.* ¶¶ 31–35; Count IV, theft and conversion, *id.* ¶¶ 36–47; and Count V, unjust enrichment, *id.* ¶¶ 48–52.[5]  Franconia answered and submitted two counterclaims.  ECF No. 81.  Counterclaim I is for breach of contract, *id.* at 26–28 ¶¶ 146–61, and Counterclaim II is for a declaratory judgment that Franconia owned Prometheus III, *id.* at 28–29 ¶¶ 162–

---

[5]    Counts IV and V and mistakenly numbered "II" and "III."  Second Am. Compl. at 7–8.

68. Franconia now moves for summary judgment on its declaratory judgment claim and all but one of Mr. Hock's claims. ECF No. 117 at 1. It does not seek summary judgment on the two breach of contract causes of action (Mr. Hock's Count III and Franconia's Counterclaim I). *Id.* Franconia also moves to exclude portions of testimony from Mr. Hock's expert, Rachael Blackburn Cozad, for the purposes of a jury trial. ECF No. 109.

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## A

"Congress enacted VARA in 1990 as an amendment to the Copyright Act 'to provide for the protection of the so-called "moral rights" of certain artists.'" *Goszczynska v. Arcadia Earth LLC*, 805 F. Supp. 3d 551, 561 (S.D.N.Y. 2025) (quoting *Hayden v. Koons*, No. 21-CV-10249 (TMR), 2025 WL 605009, at *10 (S.D.N.Y. Feb. 25, 2025)). Moral rights include the right to attribution and the right of integrity, the latter of which "allows the author [of an artwork] to prevent any deforming or mutilating changes to his

work." *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995). "In some jurisdictions the integrity right also protects artwork from destruction." *Id.*

One way VARA protects the right of integrity is by granting "the author of a work of visual art . . . the right . . . to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right." 17 U.S.C. § 106A(a)(3)(B). A "work of visual art" includes sculptures "existing in a single copy," but does not include "any work made for hire." *See* 17 U.S.C. § 106A(c)(3) (incorporating relevant provisions of 17 U.S.C. § 101). For works created after VARA's enactment in 1990, these rights last as long as the author lives. 17 U.S.C. § 106A(d)(1). An author may waive his rights under VARA by expressly agreeing to do so in a signed, written instrument. 17 U.S.C. § 106A(e)(1).

Here, the parties do not dispute that Mr. Hock was the author of *Prometheus III*, that it was a sculpture existing in a single copy, that it was destroyed intentionally, and that Mr. Hock did not waive his VARA rights. They disagree whether *Prometheus III* was a work made for hire and whether it had recognized stature.

1

Under VARA, a "work made for hire" is "a work prepared by an employee within the scope of his or her employment," or else a work falling within nine enumerated categories not relevant here.[6] 17 U.S.C. § 101(1)–(2) (under "work made for hire"

---

[6]    Those categories are the following:

> a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture

11

subsection); *see Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 736 (1989). "Employee" and "scope of employment" are undefined by the statute, so courts construe the terms' meanings according to the general common law of agency. *See Reid*, 490 U.S. at 740 (citing *Restatement (Second) of Agency* § 228 (A.L.I. 1958)).

*Reid* laid out a thirteen-factor test to determine whether an individual is an employee under § 101. Those factors are the following:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

---

> or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

17 U.S.C. § 101(2) (under "work made for hire" subsection).

*Reid*, 490 U.S. at 751–52 (footnotes omitted).  No single factor is determinative, and some factors will not be relevant in particular cases.  *See id.* at 752; *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992) ("[T]he *Reid* test can be easily misapplied, since it consists merely of a list of possible considerations that may or may not be relevant in a given case.").  "Whether a given individual is an employee or independent contractor is a question of law, which must be decided by reviewing the particular facts of each case."  *Kirk v. Harter*, 188 F.3d 1005, 1007 (8th Cir. 1999) (citation modified).

Under the Restatement, an employee's conduct is "within the scope of employment if, but only if, (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the [employer]."  *Restatement (Second) of Agency* § 228(1) (A.L.I. 1958 & Oct. 2024 Update);[7] *see Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543–44 (1999) (discussing definition).  Courts often apply the Restatement's three-part conjunctive test to determine the scope of employment in Copyright Act cases.  *See U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1015 (9th Cir. 2012); *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994); *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 186 (2d Cir. 2004); *Issaenko v. Univ. of Minn.*, 57 F. Supp. 3d 985, 1014 (D. Minn. 2014); *Rouse v. Walter & Assocs., L.L.C.*, 513 F. Supp. 2d 1041, 1056 (S.D. Iowa 2007); *Quinn v. City of Detroit*, 988 F. Supp. 1044, 1049 (E.D. Mich. 1997).

---

[7]    The Restatement includes a fourth element not relevant here.  *See Restatement (Second) of Agency* § 228(1) (A.L.I. 1958 & Oct. 2024 Update) ("(d) [I]f force is intentionally used by the [employee] against another, the use of force is not unexpectable by the [employer].").

Additionally, if the employee's conduct is "different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the [employer]," it is outside the scope of employment. *Restatement (Second) of Agency* § 228(2) (A.L.I. 1958 & Oct. 2024 Update). "The question whether or not the act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated; otherwise, it is decided by the jury." *Id.* § 228 cmt. d. Section 229 develops this requirement, explaining that "[t]o be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." *Id.* § 229(1). To determine whether conduct that is not authorized is so similar or incidental to the conduct authorized that it falls within the scope of employment, the factfinder considers these factors:

> (a) whether or not the act is one commonly done by such servants;
> (b) the time, place and purpose of the act;
> (c) the previous relations between the master and the servant;
> (d) the extent to which the business of the master is apportioned between different servants;
> (e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
> (f) whether or not the master has reason to expect that such an act will be done;
> (g) the similarity in quality of the act done to the act authorized;
> (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;
> (i) the extent of departure from the normal method of accomplishing an authorized result; and
> (j) whether or not the act is seriously criminal.

*Id.* § 229(2).

14

The parties do not dispute that Mr. Hock was an employee of Franconia when he created *Prometheus III*. *See* ECF No. 129 at 21. The record supports that position. *See* ECF No. 147 at 17:1–3 (noting that Franconia had the right to assign his tasks); *id.* at 26:13–21, 28:9–29:19 (testifying that Franconia provided Mr. Hock with W-2 Forms). Instead, they dispute the scope-of-employment prong.

There is a factual dispute whether Mr. Hock was acting within the scope of his employment when he created *Prometheus III* on all three elements of the Restatement's test. First, there is a factual dispute whether sculpting *Prometheus III* was the kind of work Mr. Hock was employed to perform. Mr. Hock's job duties included overseeing "operations," "financial management," "administrative programs," "artistic programs," as well as "mentoring," "educating," and "inspiring young artists." *Id.* at 16:4–18 (citation modified). These activities do not require creating art. While Mr. Hock's 2013 performance review incorporates his intention to continue to work on *Prometheus III*, there is at least a factual dispute whether making his own art was work he was employed to perform, as that same review includes the non-job-related goal of "tak[ing] better care of self." ECF No. 122-4 at 4. Mr. Hock funded *Prometheus III*'s construction himself, *see* ECF No. 147 at 38:12–39:7, 40:1–13, 49:10–22; ECF No. 130 ¶ 6, and built it with some of his own tools, ECF No. 147 at 73:3–8, 75:25–76:16. While some facts cut the other way—Mr. Hock stored equipment on Franconia's grounds and used some of Franconia's tools, *id.* at 77:13–24, 83:23–85:6—there is at least a genuine dispute on this element.

Second, there is a factual dispute whether *Prometheus III*'s construction was substantially within the authorized time and space limits. It is true that construction

15

occurred on Franconia's property, ECF No. 130 ¶ 7, and during ordinary working hours, ECF No. 147 at 37:2–8. But Mr. Hock testified that he created it on his own time. ECF No. 147 at 37:2–8.

Third, there is a factual dispute whether Mr. Hock created *Prometheus III* at least in part to serve Franconia. There is some record support for partial motivation. Mr. Hock testified and wrote on his Facebook page that inspiring resident artists and challenging artists generally was one motivation for creating *Prometheus III*. *Id.* at 37:9–16; ECF No. 143-1 at 6. Those goals overlap with his job responsibilities. *See* ECF No. 147 at 16:13–18 (testifying that his job duties involved mentoring, educating, and inspiring young artists). But when pressed whether he created *Prometheus III* "to inspire resident artists at Franconia," Mr. Hock responded, "And the world." *Id.* at 37:9–13. When asked whether it was "created to educate artists at Franconia," he testified, "You know, I was making it for myself." *Id.* at 37:17–19; *see id.* at 38:4–8 (attesting that educating resident artists "wasn't the reason" he made *Prometheus III*). His fullest explanation of his purpose was "[t]o make my most ambitious, monumental sculpture to date." *Id.* at 38:9–11. Resolving disputed facts in Mr. Hock's favor, he did not create *Prometheus III* to serve Franconia. And even if this element were not met, the factual disputes on the other two elements of the conjunctive test make summary judgment inappropriate here.

The § 229(2) factors do not change the analysis. A reasonable jury could conclude from this record that creating sculptures was not commonly done by Franconia employees, that Franconia did not have reason to expect Mr. Hock to create *Prometheus III*, and that it was not similar to other acts authorized. *See Restatement (Second) of Agency* § 229(2)(a),

16

(f), (g) (A.L.I. 1958 & Oct. 2024 Update).  Franconia has not pointed to evidence showing other Franconia employees created art for the park.  Mr. Hock initiated construction of *Prometheus III*, and the performance review notes that discuss it refer to it as his "personal sculpture" or his "own sculpture."  ECF No. 133 at 2; ECF No. 122-4 at 4.  Mr. Hock's other tasks were fundraising, administration, and "running the artist programs," which involved educating, mentoring, and inspiring resident artists.  ECF No. 147 at 15:21–16:18. Mr. Hock's sculpting is not so obviously similar or incidental to these tasks that the question may be resolved by the court and not the jury.  *See Restatement (Second) of Agency* § 228 cmt. d (A.L.I. 1958 & Oct. 2024 Update).

Because a reasonable jury could find that Mr. Hock was not acting within the scope of his employment when he constructed *Prometheus III*, Franconia is not entitled to summary judgment on the grounds that the sculpture was a work made for hire and therefore unprotected by VARA.  And because Franconia's counterclaim for a declaratory judgment depends on a finding that *Prometheus III* was a work made for hire under 17 U.S.C. § 101, *see* Countercl. at 29 ¶¶ 167–68, summary judgment will be denied as to that claim.

2

VARA does not define "recognized stature," but most courts have settled on the two-pronged definition from *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303, 325 (S.D.N.Y. 1994), *aff'd in part, vacated in part, and rev'd in part on other grounds*, 71 F.3d 77 (2d Cir. 1995).  In *Carter*, the court concluded that a work had recognized stature under VARA when it was (1) "viewed as meritorious," and (2) that stature was "'recognized' by

17

art experts, other members of the artistic community, or by some cross-section of society." *Id.* The Second Circuit offered a streamlined version a few decades later, holding "that a work is of recognized stature when it is one of high quality, status, or caliber that has been acknowledged as such by a relevant community." *Castillo v. G&M Realty L.P.*, 950 F.3d 155, 166 (2d Cir. 2020). Most courts have endorsed the *Carter* or *Castillo* definition. *See Martin v. City of Indianapolis* (*Martin II*), 192 F.3d 608, 612 (7th Cir. 1999) (acknowledging *Carter*'s test "may be more rigorous than Congress intended" but applying it nonetheless); *Goszczynska v. Arcadia Earth LLC*, 805 F. Supp. 3d 551, 564 (S.D.N.Y. 2025); *Miss v. Edmundson Art Found., Inc.*, No. 4:24-cv-00123-SHL-SBJ, 2024 WL 2164648, at *6 (S.D. Iowa Apr. 8, 2024); *Hunter v. Squirrel Hill Assocs., L.P.*, 413 F. Supp. 2d 517, 520 (E.D. Pa. 2005); *Scott v. Dixon*, 309 F. Supp. 2d 395, 400 (E.D.N.Y. 2004); *Phillips v. Pembroke Real Est., Inc.*, 288 F. Supp. 2d 89, 97 (D. Mass. 2003); *Pollara v. Seymour (Pollara I)*, 150 F. Supp. 2d 393, 397 (N.D.N.Y. 2001).

The *Carter-Castillo* definition is faithful to the plain meanings of "recognized" and "stature" and will be adopted here. "Stature" is a "quality or status gained by growth, development, or achievement." *Stature, Webster's New Collegiate Dictionary* (8th ed. 1973); *accord Stature, The Random House College Dictionary* (rev. ed. 1980) ("[D]egree of development attained; level of achievement."); *Stature, The New Shorter Oxford English Dictionary* (4th ed. 1993) ("Degree or level of eminence, social standing, or advancement."). Applied to works of visual art, it denotes aesthetic merit, quality, status, caliber, or achievement. Under the plain text, a work of visual art does not need to attain the highest excellence; Congress has instead screened out meritless pieces. *See Carter*,

18

861 F. Supp. at 325 ("A plaintiff need not demonstrate that his or her art work is equal in stature to that created by artists such as Picasso, Chagall, or Giacometti.").

To "recognize" is "to admit as being of a particular status." *Recognize*, *Webster's New Collegiate Dictionary* (8th ed. 1973); *accord Recognize*, *The Random House College Dictionary* (rev. ed. 1980) ("[T]o perceive as existing or true; realize."); *Recognize*, *The New Shorter Oxford English Dictionary* (4th ed. 1993) ("Acknowledge or consider *as* or *to be*."). "Recognize" may also imply "formal approval or sanction." *Recognize*, *The New Shorter Oxford English Dictionary* (4th ed. 1993); *accord Recognize*, *The Random House College Dictionary* (rev. ed. 1980) (offering "to acknowledge or accept formally" and "to show appreciation of (achievement, service, merit, etc.), as by some reward, public honor, or the like"). VARA is silent on whose recognition is relevant, but *Castillo* assigns it to a "relevant community," which is usually "the artistic community, comprising art historians, art critics, museum curators, gallerists, prominent artists, and other experts." 950 F.3d at 166. That makes sense. Experts in the relevant art community are best trained and positioned to judge and proclaim the aesthetic merits of the particular work of visual art. *Carter* agrees that the relevant community includes "art experts" and "other members of the artistic community," but adds that "some cross-section of society" could also count. 861 F. Supp. at 325; *see* Note, Christopher J. Robinson, *The "Recognized Stature" Standard in the Visual Artists Rights Act*, 68 Fordham L. Rev. 1935, 1961 (2000) (suggesting that the stature of a mural depicting a local Chicano community, created in part by the community and incorporated into the community's daily life, could be proved by community members' testimony).

19

"Recognized stature is a question of fact." *Castillo*, 950 F.3d at 167 (citation modified) (quoting Drew Thornley, *The Visual Artists Rights Act's "Recognized Stature" Provision: A Case for Repeal*, 67 Clev. St. L. Rev. 351, 365 n.81 (2019)). It is no surprise that many of these cases are resolved at trial or on a motion for preliminary injunction, postures in which factfinders weigh evidence. *See Cohen v. G & M Realty L.P.*, 320 F. Supp. 3d 421, 427 (E.D.N.Y. 2018) (bench trial with advisory jury); *Scott*, 309 F. Supp. 2d at 396 (bench trial); *Carter*, 861 F. Supp. at 311 (preliminary injunction); *Cohen v. G & M Realty L.P.*, 988 F. Supp. 2d 212, 226 (E.D.N.Y. 2013) (preliminary injunction). The *Martin I* district court granted summary judgment to plaintiffs on the recognized-stature element, the *Pollara I* district court denied summary judgment to defendants on that issue. *See Martin v. City of Indianapolis* (*Martin I*), 982 F. Supp. 625, 638 (S.D. Ind. 1997), *aff'd*, 192 F.3d 608 (7th Cir. 1999); *Pollara I*, 150 F. Supp. 2d at 398–99. Franconia has not cited any case where a court granted summary judgment to the defendant on that issue, although it has pointed to one case granting a Rule 12(b)(6) motion. *See Goszczynska*, 805 F. Supp. 3d at 564. There, the plaintiff alleged merely that she had been commissioned to present the subject artwork twice, and that she had received praise for other artwork, which was insufficient to state a plausible VARA claim. *Id.*

While stature and recognition are conceptually distinct, in practice they are often shown by the same kind of evidence—an art expert's testimony. *See Carter*, 861 F. Supp. at 325 ("[P]laintiffs generally, but not inevitably, will need to call expert witnesses to testify before the trier of fact."). Testimony from members of the relevant community is usually necessary to establish a work's aesthetic merits. *See id.*; *Scott*, 309 F. Supp. 2d at 400. And

20

courts are understandably reluctant to become the arbiters of artistic stature. *See Pollara v. Seymour (Pollara II)*, 344 F.3d 265, 271 (2d Cir. 2003) ("We steer clear of an interpretation of VARA that would require courts to assess either the worth of a purported work of visual art, or the worth of the purpose for which the work was created."); *cf. Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits."). That same expert testimony is to some extent relevant to the recognition prong as well. *See Castillo*, 950 F.3d at 166–67 (discussing expert testimony on both elements); *Carter*, 861 F. Supp. at 325–26 (same). For example, in *Carter*, the court relied on three art experts who testified that the subject work was "like almost nothing I've ever seen before," a piece displaying "tremendous" "imagination," and one that left the critic exhilarated. 861 F. Supp. at 325–26. The court found that to be evidence of "recognized stature," without distinguishing between the two elements. *Id.* at 326. That is reasonable, because the mere fact that an expert believes an artwork has merit can be evidence that the work's merit is recognized in the relevant community.

Stature and recognition can also be shown by other evidence. The facts about an artwork's exhibitions and reviews are relevant to both prongs. *See Castillo*, 950 F.3d at 170 ("Appearance at a major site—*e.g.*, the Louvre or the Prado—ensures that a work will be recognized, that is, seen and appreciated by the public and the art community. The appearance of a work of art at a curated site such as a museum or 5Pointz means that the work has been deemed meritorious by the curator and therefore is evidence of stature.").

In *Martin I*, the district court awarded summary judgment to the plaintiff and noted that among the "most compelling evidence" was that a model for the sculpture was awarded Best in Show. *Martin I*, 982 F. Supp. at 631. In very rare instances, perhaps, an artist's prominence in her field could confer stature to any work of hers, without the need for expert testimony. *See Scott*, 309 F. Supp. 2d at 400 ("For example, the court would be hard pressed to hold that a newly discovered Picasso is not within the scope of VARA simply because it has not been reviewed by experts in the art community."); *Castillo*, 950 F.3d at 166 (hypothesizing that "a 'poor' work by an otherwise highly regarded artist [might] nonetheless merit[] protection from destruction under VARA"). And it is possible that evidence inadmissible to support one prong could be admissible to support the other. Consider Judge Daniel A. Manion's partial dissent in *Martin II*. The Seventh Circuit affirmed summary judgment in favor of the plaintiff where the plaintiff had "offered no evidence of experts or others by deposition, affidavit or interrogatories." *Martin II*, 192 F.3d at 612. Instead, the plaintiff submitted newspaper and magazine articles, a letter from an art gallery director, and a letter to the editor of a newspaper, all of which were admitted over the defendant's hearsay objections. *Id.* The district court found, and the court of appeals affirmed, that this evidence was sufficient to show recognized stature. *Id.* at 612–14. Judge Manion rejected this conclusion, reasoning that the newspaper articles and letters were not admissible to prove the truth of the matter asserted—that the work of art achieved stature under VARA. *Id.* at 616 (Manion, J., concurring in part and dissenting in part). Nevertheless, he believed such evidence could be admissible to show the "recognized" element, because it would not be hearsay when used for that purpose. *Id.*

22

Lack of some evidence can be decisive as to recognition. It is hard to see how a work never publicly displayed could be recognized. *See Pollara II*, 344 F.3d at 271 (Gleeson, J., concurring) ("[A] work that has never been exhibited cannot, as a matter of law, be a work of recognized stature."); *Scott*, 309 F. Supp. 2d at 397–98, 400 (finding after a bench trial that a never-displayed work did not achieve recognized stature).

VARA grants a visual artwork's author the right "to *prevent* any destruction of a work of recognized stature," which implies that the work must have achieved recognized stature before its destruction (or threatened destruction) for the statute to apply. 17 U.S.C. § 106A(a)(3)(B) (emphasis added); *see Castillo*, 950 F.3d at 169 (affirming district court findings that focused on "the recognition the works achieved prior to" their destruction (citation modified)). But post-destruction evidence may be relevant to a finding of pre-destruction recognized stature. *See Castillo*, 950 F.3d at 169 ("In any event, the quality of a work, assessed by an expert after it has been destroyed, can be probative of its pre-destruction quality, status, or caliber."); *Pollara I*, 150 F. Supp. 2d at 397 ("[A] work's stature could be 'recognized' by experts after the destruction of the work."). Evidence of an artwork's post-destruction fame—recognition accruing only after the piece was demolished—would be immaterial to whether the work had recognized stature under VARA. *See Castillo*, 950 F.3d at 169.[8]

---

[8]    As an example, consider the botched restoration of *Ecce Homo*, an otherwise undistinguished nineteenth-century fresco of Jesus. *See* Christie Chu, *Botched Restoration of Jesus Fresco Miraculously Saves Spanish Town*, Artnet (Oct. 31, 2025), https://news .artnet.com/art-world/botched-restoration-of-jesus-fresco-miraculously-saves-spanish-town-197057. The failed attempt produced an unintentionally humorous image, which "inspir[ed] a slew of memes and parodies," "a music video," "a comic opera," and a

Here, there are factual disputes on both the "stature" and "recognized" elements, such that a reasonable jury could find that VARA protects *Prometheus III*. As to stature, Mr. Foy, an art collector, testified that the work was "pretty monumental" and approached a half-million dollar valuation. ECF No. 121-1 at 89:15–20. He also wrote a letter in which he stated the piece had "obvious artistic value" and was "quite intriguing." Two sculptors (Mr. MacGuffie and Ms. Lambert) described the work as "a mainstay of the park," "a major landmark," and "a monument." ECF No. 130-5 at 2. Other artists praised *Prometheus III* on Mr. Hock's Facebook page. ECF No. 130-4 at 20–21. Lastly, Mr. Hock's credentials as an artist provide limited but meaningful support for *Prometheus III*'s stature. *See* ECF No. 112-1 at 21 (Ms. Cozad's expert report outlining Mr. Hock's "long and distinguished career, which considers the quality of his work and the fact that his work has been exhibited and published alongside other peer and prominent artists"). His prominence is not so great that a court must find that any work of his had sufficient stature on that basis alone, *see* ECF No. 136 at 74:25–75:5 (Mr. Foy's testimony that Mr. Hock was not as accomplished a sculptor as Mark di Suvero or Alexander Liberman), but his resume is relevant to the sculpture's stature, *see Castillo*, 950 F.3d at 169–70; *Scott*, 309 F. Supp. 3d at 400. Lastly, the work was displayed at Franconia, and "Franconia is the pre-eminent, artist-centered sculpture park in the Midwest." Countercl. at 9 ¶ 1; ECF No.

---

documentary film. *Id.* Because of the restoration, the Spanish village where it was displayed welcomed 150,000 visitors in the following two years. *Id.* The ruined painting "is stamped on the town's lottery tickets and nearby vineyards are fighting over the right to use the image on wine labels." *Id.* This kind of post-mutilation notoriety would not count towards "recognized stature" under VARA.

90 ¶ 1. This consideration only goes so far, however, because the institution that exhibited *Prometheus III* later destroyed it, and has taken the legal position that it lacks recognized stature. All told, that evidence creates a factual dispute over the sculpture's stature.

Though it is a closer call, there are enough facts about *Prometheus III*'s recognition to allow a reasonable jury to find for Mr. Hock on that element. Mr. Foy wrote and testified about his pre-destruction assessment of the work, and he thought the sculpture was worth a substantial amount of money. ECF No. 130-7 at 2; ECF No. 121-1 at 89:15–20. Other sculptors and artists held similar views. ECF No. 130-5 at 2–3; ECF No. 130-4 at 20–21. A staff writer from the *Star Tribune* described the work favorably. ECF No. 121-6 at 3. A private collector purchased the *Prometheus III* maquette for $12,000. ECF No. 112-1 at 18; *see Martin I*, 982 F. Supp. at 631 (finding an award given to the subject sculpture's model to be evidence of the sculpture's recognized stature). And the fact that *Prometheus III* was exhibited at Franconia could be evidence that art experts—Franconia's Board— appreciated its artistic qualities, at least until the parties contracted to remove the piece. *See Castillo*, 950 F.3d at 170. Drawing all justifiable inferences in Mr. Hock's favor, a reasonable jury could conclude that the relevant community of art experts acknowledged the sculpture's high quality. *See id.* at 166; *Pollara I*, 150 F. Supp. 2d at 397–98 (finding that two affidavits from local art experts was sufficient to create a factual dispute over recognized stature).

Franconia argues that "lay recognition must exist at the time of removal." ECF No. 142 at 8 (citing *Castillo*, 950 F.3d at 166); ECF No. 120 at 36 (arguing that public reactions after removal are "legally irrelevant"). This is unpersuasive here because Mr. Foy, Mr.

25

MacGuffie, and Ms. Lambert described having firsthand knowledge of *Prometheus III* while it existed. ECF No. 130-7 at 2; ECF No. 130-5 at 2–3. In other words, though they recorded their appreciation after its destruction, their esteem preceded the sculpture's removal, so their reactions may be considered as evidence of recognition.

In this posture, the fact that Mr. Hock's expert provides little support does not change the analysis. It is true that "plaintiffs generally, but not inevitably, will need to call expert witnesses to testify before the trier of fact." *Carter*, 861 F. Supp. at 325. Here, Ms. Cozad did not discuss the aesthetic merits of the work. *See* ECF No. 112-1. Her report focused on stature alone, not on recognition. *See id.* at 8. She cited (1) the artists whose work has been displayed alongside Mr. Hock's; (2) respected art critics' reviews of Mr. Hock's other work; (3) the fact that *Prometheus III* was displayed at Franconia; and (4) that its removal sparked public reaction. *Id.* at 21. The first two considerations are less meaningful, though not entirely irrelevant, because they do not address the sculpture at issue. *See Scott*, 309 F. Supp. at 400 ("When determining whether a work of art is of recognized stature under VARA, it is not enough that works of art authored by the plaintiff, other than the work sought to be protected, have achieved such stature. Instead, it is the artwork that is the subject of the litigation that must have acquired this stature."); *Castillo*, 950 F.3d at 166 (noting that an artist's reputation from other pieces could support recognized stature of the subject artwork). The third consideration identifies relevant evidence, as described above, and the fourth is admissible insofar as the post-destruction evidence supports pre-destruction recognition. Ultimately, the question at this stage is whether there is a factual dispute over recognized stature, and Mr. Hock has met his burden.

26

3

Under the Copyright Act, the owner may elect to recover actual damages or statutory damages, but not both.  17 U.S.C. § 504(a)–(c).  Franconia argues that, should the VARA claim survive, Mr. Hock is entitled only to statutory damages, not actual damages.  ECF No. 120 at 37–39.  Citing cases for copyright infringement of songs and photographs, it argues that actual damages are inappropriate "where the plaintiff cannot prove a reliable market valuation for the work."  ECF No. 120 at 37–38.  But in those cases, there was *no* market for the work.  *See Dash v. Mayweather*, 731 F.3d 303, 307, 310 (4th Cir. 2013) (affirming the district court's finding that a song "did not have a market value"); *Hoffman Bros. Heating & Air Conditioning, Inc. v. Hoffman Air Conditioning & Heating, LLC*, 154 F.4th 953, 957–58 (8th Cir. 2025) (reasoning that the plaintiff had no actual damages because it failed to show that the infringed photographs created value to the defendant or harmed the plaintiff); *Giron v. Line Fin. Health Network*, No. 24-cv-03096, 2026 WL 296652, at *4–5 (N.D. Cal. Feb. 4, 2026) (granting summary judgment to the plaintiff on infringement of his photograph, but granting summary judgment to the defendant on lack of actual damages because the plaintiff failed to show non-speculative evidence of actual damages).  Here, there is evidence that *Prometheus III* had market value before it was scrapped.  *See* ECF No. 136 at 73:3–74:23 (Mr. Foy's testimony that buyers were interested but deferred a purchasing decision); ECF No. 130-7 at 2; *see* ECF No. 112-3 at 12–20 (showing nine of Mr. Hock's other sculptures sold for amounts between $2,000 and $20,000).  So Mr. Hock may elect to seek actual damages.

B

Franconia argues that Mr. Hock's state-law claims for negligence, theft and conversion, and unjust enrichment fail because he did not own *Prometheus III* at the time of its removal, but rather had abandoned it.[9] ECF No. 120 at 42–45.

To prevail on each claim, Mr. Hock must show that he had a property interest in the sculpture. In Minnesota, the elements of negligence are "(1) duty; (2) breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that plaintiff did in fact suffer injury." *Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149, 157 (Minn. 1982) (citation modified). Mr. Hock alleges Franconia owed him a duty of care "to preserve the work and provide [him] ample notice in the event [Franconia] intended or planned to modify, harm or damage such sculpture in any way." Second Am. Compl. ¶ 27. That duty could exist only if Mr. Hock had a property interest in the sculpture. Minnesota's theft and conversion claims hinge on the defendant depriving the plaintiff of personal property. *See* Minn. Stat. § 604.14, subdiv. 1 ("A person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater."); *OnePoint Sols., LLC v. Borchert*, 486 F.3d 342, 347–48 (8th Cir. 2007); *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003) ("Conversion occurs where one willfully interferes with the personal property of another 'without lawful justification,' depriving the lawful possessor of 'use and possession.'" (quoting *DLH, Inc. v. Russ*, 566

---

[9] Abandonment does not apply to VARA rights, which instead may be waived by the author only by a signed, written instrument. 17 U.S.C. § 106A(e)(1).

N.W.2d 60, 71 (Minn. 1997)).   "To establish a claim for unjust enrichment under Minnesota law, the plaintiff must 'show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay.'"  *Schaaf v. Res. Funding Corp.*, 517 F.3d 544, 553–54 (8th Cir. 2008) (quoting *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996)). As Mr. Hock has framed that cause of action, Franconia "unlawfully received benefits from its unauthorized destruction" of *Prometheus III*, "failure to return Plaintiff's property," and "unauthorized disposition and sale of Plaintiff's property"—all of which assert a property interest in the sculpture.  Second Am. Compl. ¶ 49.

In Minnesota, "abandonment 'is the voluntary relinquishment, surrender, or disclaimer of a known property right, absolutely and without reference to any particular person or purpose.'"  *Zephier v. Agate*, 957 N.W.2d 866, 872 (Minn. 2021) (quoting *Bd. of Trs. of First Congregational Church of Austin v. Cream City Mut. Ins. Co. of Milwaukee*, 96 N.W.2d 690, 693–94 (Minn. 1959)).  The former owner must actually relinquish the property and intend to part with it permanently.  *Id.*  "Intent can be inferred from the owner's 'conduct and the nature and situation of the property.'"  *Id.* (quoting *Erickson v. Sinykin*, 26 N.W.2d 172, 176 (Minn. 1947)).  Whether an individual abandoned his property is a fact-intensive analysis.  *Id.*; *In re Application of Berman*, 247 N.W.2d 405, 408 (Minn. 1976) (determining abandonment by considering length of time, failure to take possession of the property, and failure to assert right to the property, among other factors).

There is a factual dispute whether Mr. Hock relinquished and intended to part with *Prometheus III*.  He communicated with Mr. Isherwood and Mr. Foy in September and

29

October 2023 about selling or relocating the sculpture. ECF No. 132 at 220:22–222:20. Though he let the work remain on Franconia's grounds several years after agreeing to remove it, some facts indicate the absence of relinquishment and intent. The sculpture was 53 feet tall and 34,000 pounds, so difficult to remove. ECF No. 130 ¶ 6; *see* ECF No. 130-7 at 2 ("The sheer size of this work of art obviously made its possible location/destination a problem."). The parties' settlement agreement set no timeline for removal. ECF No. 122-3 at 6. Resolving disputed facts in Mr. Hock's favor, Franconia did not inform him that it intended to scrap the sculpture. ECF No. 122-8 at 2; ECF No. 147 at 194:25–195:14. A reasonable jury could conclude that Mr. Hock had not abandoned his property interest in the sculpture, so Franconia is not entitled to summary judgment on the state-law claims.

III

Federal Rule of Evidence 702 governs the admissibility of expert testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

30

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591–94 (1993). District courts have "wide latitude in determining whether an expert's testimony is reliable." *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010) (quoting *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1057 (8th Cir. 2005)). As long as the evidence indicates that the expert evidence is reliable and relevant, "no single requirement for admissibility" governs. *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

*Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)). The proponent of the expert opinion bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies Rule 702. *Khoury*, 614 F.3d at 892.

Mr. Hock's expert witness is Rachael Blackburn Cozad. ECF No. 112-1 at 8. Ms. Cozad has over thirty years' experience in the fine arts field. *Id.* at 10. She has a Bachelor of Arts degree in art history from Texas Christian University, a Master of Arts degree in art history from California State University, Los Angeles, and Uniform Standards of Professional Appraisal Practice ("USPAP") certification. *Id.* Ms. Cozad's objective was to "[p]rovide an unbiased fair market value for litigation purposes" and to "[p]rovide an

unbiased opinion as to whether [*Prometheus III*] possesses the requisite 'stature'" under VARA. *Id.* at 8.

Ms. Cozad examined *Prometheus III*'s fair market value with two methods. *Id.* at 18. The first method was the sales comparison approach, which sets the value by analyzing sales of the artist's similar artworks. *Id.* Here, Ms. Cozad found only one comparable piece, the *Prometheus III* maquette, which sold for $12,00 in 2001. *Id.*; ECF No. 112-2 at 104:14–20 (Ms. Cozad's testimony that she considered Mr. Hock's prior sales, but found the maquette to be the only proper comparator). That work was much smaller, standing 38 inches tall. ECF No. 112-1 at 18. Using the formula for the surface area a rectangular prism, and measuring the maquette at its greatest height, width, and depth, Ms. Cozad determined its price per square inch. *Id.*; ECF No. 112-2 at 144:15–24. She then calculated the surface area of the full-size sculpture with the same formula, and she multiplied that surface area by the price per square inch, reaching a value of $5,241,873. ECF No. 112-2 at 144:24–145:4; ECF No. 112-1 at 18.

The second method was the cost approach, which estimates the price to recreate or replace an artwork. ECF No. 112-1 at 19; ECF No. 112-2 at 156:13–17. Ms. Cozad received information about *Prometheus III*'s "materials, dimensions, labor etc." from Mr. Hock and then consulted two "[f]abricators and foundries" for estimates. ECF No. 112-1 at 19. Versteeg Art Fabricators, LLC, estimated that *Prometheus III* would cost $1,000,000, and UAP Company estimated $1,250,000. *Id.* Ms. Cozad adjusted for inflation by reducing the price of steel, so the fabricators' estimates became $906,025 and $1,112,275. *Id.*

Ultimately, she concluded that *Prometheus III*'s fair market value was $1,300,000, which was a number in the middle of the two fabricators' estimates, increased by 30% to account for Mr. Hock's time and expertise. *Id.* at 20. In her words, the baseline was "the median estimate . . . for the sculpture to be industrially re-created by an appropriate fabricator." *Id.*; *see id.* at 19 (setting cost approach range at $906,025 and $1,112,275).[10] This calculation only employed the cost approach; her final figure did not rely on the sales comparison approach. *Id.*; *see* ECF No. 112-2 at 140:2–25 (testifying that she "did not rely upon [the sales comparison approach] very heavily because it just wasn't very realistic," that "it wasn't as good of an approach as the cost approach," and that "the cost approach really seemed to be the most meaningful in this whole instance").

Ms. Cozad included an "Accompanying Budget Note," which identified the market value of two large public sculptures to show that a valuation around $1,000,000 was "not unusual." ECF No. 112-1 at 20. Those sculptures are Keith Sonnier's *Double Monopole* in Kansas City, Missouri, commissioned in 2005 for $800,000 and appraised in 2014 for $1,400,000, and R.M. Fischer's *Sky Stations*, also in Kansas City, commissioned in 1994 for $1,100,000 and appraised in 2014 for $5,000,000. *Id.*

Lastly, Ms. Cozad opined that *Prometheus III* "qualifies as a work of 'stature'" under VARA. *Id.* at 21. As noted above, her discussion cites (1) the artists whose work has been displayed alongside Mr. Hock's; (2) respected arts critics' reviews of Mr. Hock's

---

[10]   The midpoint of the two numbers is $1,009,150—easily rounded to $1,000,000. Tacking on 30% makes a sum of $1,300,000.

other work; (3) the fact that *Prometheus III* was displayed at Franconia; and (4) that its removal sparked public reaction. *Id.*

Franconia seeks to exclude Ms. Cozad's valuation opinion—both the sales comparison approach and the cost approach—and all of her stature opinion except for the fact that *Prometheus III* was displayed at Franconia. ECF No. 110 at 40–41.

A

The sales comparison portions will be excluded because they will not help the jury understand the evidence or determine a fact in issue. *See* Fed. R. Evid. 702(a). Ms. Cozad did not rely on the sales comparison approach to generate the sculpture's fair market value. The report described a "combined approach," but it determined the final value with reference to the cost approach alone. *See* ECF No. 112-1 at 18, 20. Ms. Cozad used the median estimate of the fabricators' estimates, plus 30%, to arrive at $1,300,000. ECF No. 112-1 at 19–20. She did not incorporate the sales comparison figure of $5,241,873 into that calculation. *See id.* at 18–20. Her deposition testimony is consistent with a one-track rather than hybrid analysis. *See* ECF No. 112-2 at 140:2–25. In her view, the sales comparison method "wasn't as good of an approach as the cost approach," and "the cost approach really seemed to be the most meaningful in this whole instance." *Id.* at 140:14–16, 24–25. She attested that "the cost approach is a more accurate representation of fair market value than the sales comparison approach," at least for this artwork. *Id.* at 147:15–19. Because she did not use the sales comparison approach in calculating market value and testified to its deficiencies in this circumstance, testimony about that method would not help the trier of fact understand the evidence or determine material facts. *See* Fed. R.

34

Evid. 702(a).  Instead, it could only serve to prejudice the jury by suggesting that a far higher, inappropriate valuation was reasonable.

Additionally, I agree with Franconia's argument that this version of the scaling method is unreliable here.  ECF No. 110 at 25–29.  Ms. Cozad testified that scaling was "a very common practice . . . especially . . . when artists make things that are similar but in different sizes," and that it is "generally an acceptable approach for appraisers to use when there's a shortage of good comparable sales data."  ECF No. 112-2 at 138:10–13, 145:8–13.  Here, this statement is insufficient to show reliable principles and methods.  *See* Fed. R. Evid. 702(c).  To start, there is the commonsense objection that an artwork's value is unlikely to increase in proportion to its size.  Perhaps the large artwork is costly to move.  *See* ECF No. 112-1 at 19 (Ms. Cozad's testimony that "works created on this massive scale are very expensive to relocate").  Perhaps demand is suppressed because few buyers have the space to display it.  *See* ECF No. 130-7 at 2 ("Few collectors or . . . institutions have the required space necessary to exhibit this piece in a sympathetic, complementary site.").  Perhaps the piece is aesthetically compelling for reasons unrelated to its size.  And even if a larger sculpture is usually worth more than its smaller counterpart, why should the value increase geometrically?  Why should a sculpture with twice the surface area double in value? Ms. Cozad does not address this fundamental flaw.  Next, she cites no case or other authority where an appraiser used the scaling approach.  Mr. Hock has not shown that the USPAP standards approve this method.  Ms. Cozad's report aimed to conform to those standards, ECF No. 112-1 at 8, and they required her to list "extraordinary assumptions necessary in the assignment," along with a "reasonable basis" for them.  ECF No. 112-4 at

35

9 (Standard 7-2(f)).  Ms. Cozad did not include this assumption in her report.  *See* ECF No. 112-1 at 13 ("Extraordinary Assumptions" section).  So Mr. Hock has not met his burden to show this portion of the expert report is admissible under Rule 702.

If it mattered, I am not persuaded that this portion deserves exclusion because it relied on insufficient facts or data.  *See* Fed. R. Evid. 702(b).  Franconia argues that Ms. Cozad failed to apply the most pertinent evidence, which are Mr. Hock's prior sales.  ECF No. 110 at 20–25; *see* ECF No. 112-2 at 104:14–20.  Instead, she compared *Prometheus III* to its maquette and to no other sculpture.  At least one of Franconia's cited authorities supports the position that, for artwork valuation, "an appraisal based on comparable sales cannot rest on one sale alone."  *King v. Wang*, No. 14-cv-7694 (LJL), 2021 WL 5237195, at *13 (S.D.N.Y. Nov. 9, 2021).  In another case, the court excluded a valuation opinion because the expert did not explain how she "compared [the subject] sketches to other similar works in order to ascertain their value—whether she looked at auctions or private sales, when comparable sales occurred, and what factors were considered in selecting the comparable works and how those factors were weighed."  *Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*, No. 11 Civ. 1237(LGS)(JCF), 2014 WL 1468118, at *8 (S.D.N.Y. Apr. 15, 2014).  And a third court excluded testimony that failed to "clarify the full set of factors that play a role in this analysis" or "explain how these factors interact or how much weight each factor is assigned in [the expert's] calculus."  *Davis v. Carroll*, 937 F. Supp. 2d 390, 417 (S.D.N.Y. 2013).

This argument is based on nonbinding authority and cuts against the "general rule" that "the factual basis of an expert opinion goes to the credibility of the testimony, not the

admissibility." *Bonner*, 259 F.3d at 929 (quoting *Hose*, 70 F.3d at 974); *see Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Ms. Cozad explained why she judged *Prometheus III* against only one work: Large sculptures like this one tend to be site-specific, so they are rarely publicly traded; they are costly to relocate; and they can suffer damage during disassembly as part of the moving process. ECF No. 112-1 at 18–19. She considered Mr. Hock's other sales but concluded they were poor comparators. ECF No. 112-2 at 104:14–20. If this opinion were admitted, Franconia would have the opportunity to cross-examine Ms. Cozad about the factual basis of her testimony.

B

Franconia seeks to exclude the cost approach valuation portion for two reasons. First, it argues that replacement cost will often not reasonably approximate fair market value. ECF No. 110 at 30–31. That is unpersuasive here. The cost approach is an approved method under USPAP guidelines. *See* ECF No. 112-4 at 10 (Standard 7-4(b)). Ms. Cozad testified cogently about why she adopted it—namely, the other approved methods were less applicable. ECF No. 112-2 at 64:8–65:6. In briefing and at oral argument, Franconia identified no case reasoning that the cost to replace an artwork was not in principle a proxy for market value. And Franconia's point that the cost to replace a Minneapolis office building may far exceed its current fair market value is one that a jury can grasp. *See* ECF No. 110 at 30; *Daubert*, 509 U.S. at 596.

37

The second argument is persuasive.    Franconia argues that Ms. Cozad inappropriately relied on and repeated hearsay from other experts, the individual fabricators who estimated the cost to replace *Prometheus III*.  ECF No. 110 at 31–33; *see United States v. Grey Bear*, 883 F.2d 1382, 1392–93 (8th Cir. 1989) ("We are persuaded that Fed. R. Evid. 703 does not permit an expert witness to circumvent the rules of hearsay by testifying that other experts, not present in the courtroom, corroborate his views."). Relatedly, Franconia seeks exclusion for Mr. Hock's failure to disclose these experts.  ECF No. 110 at 34–36.  Mr. Hock concedes that the fabricators' estimates are inadmissible hearsay but argues that Ms. Cozad's opinion in reliance on those figures is admissible under Rule 703.  ECF No. 138 at 22.

Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703; *see Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997) (admitting expert testimony where the district court confirmed that the underlying information "was of the type reasonably relied upon by experts in the field and that it was reasonably relied upon by [the expert] in forming his opinion"); *Bliv, Inc. v. Charter Oak Fire Ins. Co.*, 159 F.4th 539, 542–43 (8th Cir. 2025).  "[W]here a witness's opinion testimony is based on inadmissible matter, that testimony is itself inadmissible

38

unless the witness qualifies as an expert." 29 *Wright & Miller's Federal Practice & Procedure* § 6273 (2d ed. 2016 & Apr. 2026 Update); *see S. Cent. Petroleum, Inc. v. Long Bros. Oil Co.*, 974 F.2d 1015, 1018–19 (8th Cir. 1992) (affirming decision to admit expert testimony where the "district court expressly limited the admission to the expert's opinion and did not admit the information on which the expert based his opinion"); *Brennan v. Reinhart Institutional Foods*, 211 F.3d 449, 451 (8th Cir. 2000) ("Obviously, it is helpful when trial courts instruct juries as to the limited applicability of the hearsay evidence by informing the jury that the hearsay is inadmissible as substantive evidence to prove the truth of the fact asserted."). Many courts have excluded expert testimony that simply echoed another individual's opinion and failed to assess its validity or reach an independent conclusion. *See, e.g.*, *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014) ("An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy."); *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985); *In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 932 (D. Minn. 2020); *City of Almaty v. Ablyazov*, No. 15-cv-5345 (AJN), 2021 WL 5154110, at *9 (S.D.N.Y. Nov. 5, 2021) (allowing expert to testify about the quality of an appraisal but excluding the appraisal value); *Schoen v. State Farm Fire & Cas. Co.*, 638 F. Supp. 3d 1323, 1334–37 (S.D. Ala. 2022) (collecting cases).

Ms. Cozad's cost approach testimony does not apply her expertise to the fabricators' estimates, so it will be excluded. All the essential calculations—the cost of materials, tools, and labor—were done by the fabricators. *See* ECF No. 112-1 at 19. Ms. Cozad did not analyze those estimates, as the USPAP rules require. *See* ECF No. 112-4 at 10 (instructing

appraisers using the cost approach to "analyze such comparable cost data as are available to estimate the cost new of the property" and "analyze such comparable data as are available to estimate the difference between cost new and the present worth of the property (depreciation)"). She accepted those figures. In its entirety, her contribution was to (1) adjust for inflation, (2) find the midpoint of the two figures, and (3) add 30% for Mr. Hock's labor and expertise. ECF No. 112-1 at 20. Applying these basic mathematical operations does not make her valuation an assessment of the fabricators' estimates or an independent opinion. Ms. Cozad's expertise played a minimal role; a lay witness can do that math. Even assuming she did analyze the underlying opinion, it is not feasible to admit that analysis without admitting the fabricators' estimates. *See S. Cent. Petroleum, Inc.*, 974 F.2d at 1018–19; *Brennan*, 211 F.3d at 451. A jury cannot realistically evaluate whether the inflation-adjusted midpoint between the fabricators' estimates is credible without being allowed to consider whether the estimates are good measurements of *Prometheus III*'s fair market value. Even if Rule 703 were no barrier to admissibility, Ms. Cozad's opinion would run afoul of Rule 403, because the probative value of her contribution—the arithmetic—would be substantially outweighed by a danger of prejudice from considering the fabricators' hearsay valuations. *See* Fed. R. Evid. 403; *Barrel of Fun, Inc. v. State Farm Fire & Cas. Co.*, 739 F.2d 1028, 1033–34 (5th Cir. 1984) (finding inadmissible testimony that complied with Rule 703 but violated Rule 403), *abrogated on other grounds by*, *Daubert*, 509 U.S. at 579, *as recognized by*, *United States v. Posado*, 57 F.3d 428, 429 (5th Cir. 1995); 29 *Wright & Miller's Federal Practice & Procedure* § 6273 (2d ed. 2016 & Apr. 2026 Update) (noting that in rare instances evidence may excluded

40

under Rule 403 even if it is admissible under Rule 703).  And Ms. Cozad's declaration does not change the outcome.  It is true she testified that certified professional art appraisers "commonly communicate with art fabricators as part of their appraisals" and "reasonably rely on information obtained from art fabricators in forming their appraisal opinions," especially when applying the cost approach to large steel sculptures.  ECF No. 139 ¶ 2. She did something similar "as part of [her] appraisals" of *Double Monopole* and *Sky Stations*.  *Id.* ¶ 3.  The problem is not reasonable reliance but that her opinion is not truly independent of the fabricators' conclusions.  For these reasons, Ms. Cozad's cost approach valuation is not admissible and will be excluded.

C

Franconia seeks to exclude the "Accompanying Budget Note," which provides the commission and appraisal prices of two other large public sculptures.  ECF No. 110 at 36– 38.  I agree.  Ms. Cozad testified that *Double Monopole* and *Sky Stations* were included "to show that a million dollar budget is not unusual for a piece of public art that is made out of metal, industrial fabricated [sic], or fabricated by the artist."  ECF No. 112-2 at 186:10–18. In her view, they were not comparators but "supporting illustrations."  *Id.* at 186:20–23.  I do not see how "supporting illustrations" can be relevant if they are not comparators.  The fact that other sculptures are worth a million dollars is material to *Prometheus III*'s value only if those pieces are sufficiently similar to *Prometheus III*.  Ms. Cozad testified *Double Monopole* and *Sky Stations* were not comparable to the subject artwork, so their seven-figure valuation is not relevant to *Prometheus III*'s fair market value.  This portion will be excluded.

D

Franconia seeks to exclude Ms. Cozad's opinion that *Prometheus III* qualifies as having "stature" under VARA. ECF No. 110 at 38–40. For the reasons explained with respect to stature in Part II.A.2, this argument fails. Other courts have explained that an artist's general reputation, past works, and community recognition are relevant to the subject artwork's stature. *See Castillo*, 950 F.3d at 166; *Carter*, 861 F. Supp. at 325. This portion will not be excluded.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Franconia's Motion for Partial Summary Judgment [ECF No. 117] is **DENIED**.

2.     Franconia's Motion to Exclude Certain Testimony of Plaintiff's Expert Rachael Blackburn Cozad [ECF No. 109] is **GRANTED IN PART** and **DENIED IN PART** as described in this Opinion.

Dated:  June 2, 2026              s/ Eric C. Tostrud
                                  Eric C. Tostrud
                                  United States District Court